2021 IL App (2d) 190144-U
No. 2-19-0144
Order filed April 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1186 |
| JEFFERY D. MERRIWEATHER, | ) ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: There was sufficient evidence for the jury to conclude, for purposes of defendant's home-invasion charge, that he entered the victim's mobile home without authority, specifically by using a planned ruse to gain access to the home to rob the victim of cash that he had witnessed on her person when he was in the home on a previous visit with companions.

¶ 2    After a jury trial, defendant, Jeffery D. Merriweather, was convicted of home invasion (720 ILCS 5/19-6(a)(3) (West 2016)) and armed robbery (*id.* § 18-2(a)(2)) and sentenced to concurrent terms of 22 years' imprisonment. Defendant appeals his conviction of home invasion, contending that he was not proved guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     As pertinent here, the indictment against defendant alleged that, on April 20, 2017, he committed home invasion in that, without authority, he entered the dwelling place of Donna Ridolfi on Elaine Avenue in Park City and remained inside after knowing that she was present, and, while armed with a firearm, threatened the imminent use of force upon her. The indictment alleged further that defendant committed armed robbery in that, while armed with a revolver, he knowingly took currency from Ridolfi by threatening the imminent use of force.

¶ 5     At trial, the State's first witness, Park City police officer Spencer Jurney, testified that, on April 20, 2017, at about 9:30 a.m., he was dispatched to a mobile home on Elaine Avenue. He saw Ridolfi, who had blood in her hair and on her left cheek and a deep gash in her head. Two other officers searched the trailer.

¶ 6     Edwin Ruiz, a Park City police detective, testified that, on the afternoon of April 20, 2017, he spoke to Ridolfi after she was released from a hospital. Ridolfi said that two men, both African-American, had visited her that morning. One, known as "Zoe," was short. The other was tall. On April 21, 2017, Ridolfi viewed a photo lineup and identified defendant as the tall man. A week later, she viewed another photo lineup and identified "Zoe," whom Ruiz later learned was Fazon Roberson. On August 28, 2017, Ruiz took buccal swabs from defendant and sent the samples to the crime laboratory.

¶ 7     Ridolfi testified as follows. On April 20, 2017, she lived alone in her two-bedroom trailer on Elaine Avenue. Her boyfriend visited occasionally. Previously, Ridolfi had let Jessica Simmons live there. The power had been turned off because the bill had not been paid. At about 6 a.m. on April 20, 2017, Ridolfi was asleep in her car. Simmons came to the window and woke her up. Simmons was accompanied by two men whom Ridolfi had never seen before but later learned

were defendant and Roberson. Simmons asked to use the trailer's front bedroom so that she could have sex with defendant. Ridolfi had no objection. Simmons asked her whether she had a condom; Ridolfi did not, but defendant said that he had one. Simmons and defendant entered the bedroom, and Ridolfi and Roberson were left together in the trailer. They conversed for a while. Eventually, Simmons and defendant exited the bedroom. They and Roberson left the trailer and drove away.

¶ 8    Ridolfi testified that, about 10 minutes later, defendant and Roberson returned and met her outside the trailer. Defendant told Ridolfi that he had left his phone in her bedroom and needed to get it. Ridolfi let him enter the trailer. Deciding to keep an eye on him, she walked in behind him. In the kitchen, defendant asked her, " 'Can I use your phone? I can't find mine.' " Ridolfi started to hand her phone to defendant. As he took it, he put a gun up to her head. He started telling her to give him "the money." Ridolfi asked what money he meant. She had $240 cash that she was going to use to pay her electric bill. Before she could hand him the cash, he hit her in the head with the gun, knocking her to the floor and causing her head to bleed. After she gave him the money, he asked where the rest of it was. She said she had no more money, and he hit her twice on the head. He demanded to know where she kept her jewelry, but she said she had none. Defendant told Ridolfi that if she told anyone what had happened, he would kill her.

¶ 9    Ridolfi testified that defendant told Roberson to tie her up. Roberson put a shirt around her neck and pulled the shirt over her face. Roberson had not been present when defendant initially pulled the gun on Ridolfi, and he appeared not to want to be there now. The men took Ridolfi into the bathroom and left. After about 10 minutes, Ridolfi exited the bathroom, went outside, and sat on the front stoop. An acquaintance saw her and called the police. Several officers arrived. Ridolfi spoke to them. A few minutes later, her boyfriend arrived and drove her to the hospital. There, some staples were put into her head.

¶ 10    Ridolfi testified that, after she left the hospital, she called Simmons and yelled at her about the incident. Simmons apparently had not realized that defendant and Roberson had returned to Ridolfi's trailer. She told Ruiz that the tall man was named "Jeff Merriweather" and that the condom was in the garbage can. Later, Ridolfi retrieved the condom and brought it to Ruiz at the police station. The next day, she identified defendant from a photographic lineup as the tall man who had attacked her. A week later, she identified Roberson from a photographic lineup.

¶ 11    After Ridolfi concluded her testimony, the parties stipulated that, were she asked whether she bought drugs from defendant, she would testify that she did not.

¶ 12    Roberson testified as follows. He had accepted a plea bargain in return for testifying against defendant, his cousin. He resided in North Chicago. On the morning of April 20, 2017, he, defendant, and Simmons drove to Ridolfi's trailer. Ridolfi was asleep in her car. Simmons rapped on the window and woke her up. All four people entered Ridolfi's trailer. There, defendant sold an "item" to Ridolfi, which she paid for with $20 of the large supply of paper money that she removed from her bra. She restored the other bills to her bra. Simmons and defendant then entered the bedroom and stayed there for 10 to 15 minutes while Roberson and Ridolfi conversed. Upon exiting the bedroom, defendant asked Ridolfi whether she would like to purchase another "item." She said no, because she needed all her money for her power bill. The visitors left and drove off.

¶ 13    Roberson testified that, on the drive, there was a conversation about Ridolfi. Defendant spoke about "poking" her, but he did not explain what he meant. After they dropped off Simmons at her trailer, defendant told Roberson that he believed that he had left his phone at Ridolfi's trailer and that they should go back there to retrieve the phone and then leave. Roberson was in a hurry because he was already late for a date with his girlfriend.

¶ 14    Roberson testified that he and defendant returned to Ridolfi's trailer. Ridolfi was outside. Defendant exited the car, and he and Ridolfi entered the trailer together. Roberson stayed outside for 10 or 15 minutes, talking on his phone to his girlfriend. Eventually, he entered the trailer. He saw that Ridolfi had blood on her face and defendant was pointing a gun at her head. He was demanding money and threatening to "smoke" her if she did not give him it. Ridolfi was screaming. Defendant told Roberson to close the door, which Roberson did. Defendant was still demanding money and told Roberson to take it from her. Ridolfi reached into her bra and handed some money to Roberson. Roberson then handed the money to defendant. Defendant told Ridolfi that that was not all the money she had. Ridolfi was crying and said that her boyfriend would be home soon. Defendant said that he would "smoke" him too. "Smoke" meant to shoot someone.

¶ 15    Roberson testified that next, defendant told him to tie up Ridolfi, which he did with a piece of clothing. He did not know what was going to happen. Defendant never put the gun away. He and Roberson left the trailer and got into the car. Defendant told Roberson that, if he ever spoke about what happened, defendant would kill him. At defendant's command, Roberson took the gun from him and put it into the glove compartment.

¶ 16    Roberson testified that he had never been to Ridolfi's trailer before April 20, 2017. He did not bring the gun there and never handled it until he and defendant drove off the second time. The robbery had not been his idea.

¶ 17    The parties stipulated that a forensic scientist with the crime lab would testify that the DNA on the condom and the buccal swabs matched defendant's profile.

¶ 18    In its closing argument on the home invasion charge, the State contended that defendant's second entry into Ridolfi's trailer was unauthorized, because she did not grant him permission to attack or rob her. The State also argued that, after he left Ridolfi's trailer the first time, defendant

planned the attack: he had seen that Ridolfi had a large amount of cash on her person, that she was alone, and that Roberson could be coerced into doing what he wanted and keeping quiet afterward. Defendant pretended to have left his cell phone in Ridolfi's trailer, so as to trick her into letting him in and placing herself in a position to be robbed. When Ridolfi fell for the ruse, defendant showed no interest in recovering his phone but instead swiftly went through with his plan of putting the gun to her head and demanding her money while Roberson was outside and did not know what was happening. In his closing argument, defendant did not respond to this theory but instead contended that there was a reasonable doubt of the identity of the person who attacked and robbed Ridolfi.

¶ 19    The jury found defendant guilty of both home invasion and armed robbery. He was sentenced to concurrent 22-year prison terms. We allowed defendant to file a late notice of appeal.

¶ 20                                                    II. ANALYSIS

¶ 21    On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of home invasion. As pertinent here, the home-invasion statute reads:

> " (a) A person who is not a peace officer acting in the line of duty commits home invasion when *without authority* *** he or she knowingly enters the dwelling place of another and remains in the dwelling place until he or she knows or has reason to know that one or more persons is present*** and
>
> * * *
>
> > (3) While armed with a firearm uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs." (Emphasis added.) 720 ILCS 5/19-6(a)(2) (West 2016).

¶ 22    Defendant contests the proof of only one element of the charged offense: the lack of authority for his second entry into Ridolfi's trailer. Defendant notes that it was uncontested that Ridolfi granted his request to enter her trailer. He recognizes that consent to enter a dwelling does not mean authority to commit a crime within. See *People v. Bush*, 157 Ill. 2d 248, 253 (1993). However, he contends, the evidence left a reasonable doubt that he had entered with any criminal intent. Defendant argues that the jury had to engage in speculation in order to reject the theory that he entered for the reason that he gave Ridolfi and decided only afterward to rob her.

¶ 23    When faced with a challenge to the sufficiency of the evidence, we ask whether, after viewing all of the evidence in the light most favorable to the State, any rational factfinder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 24    We hold that the State proved beyond a reasonable doubt that defendant entered without authority, because he secured entry into Ridolfi's trailer by deception while actually intending to commit a crime. Essentially, defendant requests us to reweigh the evidence and to decline to defer to the jury's exercise of its prerogative to draw reasonable inferences about defendant's intent.

¶ 25    In *Bush*, the supreme court explained:

"[W]hen a defendant comes to a private residence and is invited in by the occupant, authorization to enter is limited and *** criminal actions exceed this limited authority. [Citation.] No individual who is granted access to a dwelling can be said to be an authorized entrant if he intends to commit criminal acts therein, because, if such intentions had been

communicated to the owner at the time of entry, it would have resulted in the individual's being barred from the premises *ab initio*. [Citation.] Thus, the determination of whether an entry is unauthorized depends on whether the defendant possessed the intent to perform a criminal act therein at the time entry was granted." *Bush,* 157 Ill. 2d at 253-54.

¶ 26 In turn, the State can prove a defendant's intent by inferences drawn from his conduct and surrounding circumstances. *People v. Hopkins*, 229 Ill. App. 3d 665, 672 (1992).

¶ 27 Here, defendant's conduct and the surrounding circumstances enabled the jury to find beyond a reasonable doubt that, before he entered Ridolfi's trailer the second time, he formed the intent to do so in order to commit a crime. Thus, a rational factfinder could conclude that his stated purpose, to retrieve his phone, was a pretext to trick Ridolfi into allowing him inside.

¶ 28 The evidence proved that, no later than when he departed the first time, defendant knew that Ridolfi had a large amount of cash on her person; that she lived alone; and that she was friends with Simmons. These facts made Ridolfi a prime target for an armed robbery, if defendant could successfully undertake it. On the ride away from Ridolfi's trailer, defendant mentioned "poking" her; although this term was not defined, a natural inference was that defendant intended some sort of attack. In any event, the jury could find that defendant had formed his criminal purpose well in advance of the act, even if he did not articulate it in the car. Cluing in Simmons and Roberson was not essential to his plan. If anything, he wanted them to know nothing in advance. Also, he might have formed his plan sometime after he made his remark about "poking" her.

¶ 29 After dropping off Simmons, who would thus not be a possible deterrent or a witness to an attack on Ridolfi, defendant then decided to return to Ridolfi's trailer, accompanied by Roberson. Defendant told Roberson that the reason was to retrieve his phone. The jury could find that this was a planned deception to neutralize any suspicion that Roberson might have had about why

defendant would want to go back to Ridolfi's trailer and to ensure that Roberson was not present at the robbery until defendant had full control of the situation.

¶ 30    When defendant arrived at Ridolfi's trailer, Roberson stayed outside, apparently not suspecting that defendant had any criminal plan. After meeting Ridolfi, defendant soon got inside with her with nobody else present. The jury could find that, although he told her that he was there merely to look for his phone, he never really intended to do so. Not only did he do little if any searching for his phone, but he soon asked Ridolfi if he could use her phone. The jury could reasonably find that this was a planned ruse to bring Ridolfi within his reach and distract her just long enough for defendant to clap the gun to her head, which was what he did.

¶ 31    There was no compelling ground for the jury to entertain a reasonable doubt of whether defendant decided on the armed robbery only after he entered Ridolfi's trailer. All the incentive that he needed for his crime was available and known to him before then. His actions in returning to the trailer, misleading Roberson, and attacking Ridolfi were wholly consistent with a preexisting intent and less consistent with a late-blooming, spontaneous impulse.

¶ 32    Defendant raises a number of reasons why the jury was compelled to find a reasonable doubt of his intent. None are persuasive.

¶ 33    First, defendant argues that Roberson testified that 10 to 15 minutes passed between when defendant entered and when he entered. This proves nothing in particular, as Roberson did not know what defendant was doing inside and Ridolfi testified that defendant not only spoke to her but also attacked her twice and repeatedly demanded to know where the rest of her money was. Whatever the exact length of time between defendant's entry into the trailer and the start of his attack on Ridolfi, the interval says little if anything about his intent.

¶ 34   Next, defendant argues that he met Ridolfi outside and did not know that she would enter the trailer. This in no way weakened the inference that defendant intended to commit a crime inside the trailer. The jury could infer defendant's plan that if he told Ridolfi that he had left his phone inside, she would accompany him there, not only to help him search but also because she wanted to keep an eye on a stranger in her trailer.

¶ 35   Next, defendant notes that on the first visit, he saw that Ridolfi had a great deal of cash on her person. From this, he argues that, had defendant sought to commit the crime, he would have taken the money at that time. But this is simply a *non sequitur*. That defendant saw the money the first time was not at all inconsistent with the conclusion that he did not decide until later to attempt to steal the money. First, there is nothing inherently implausible about such a conclusion. Second, during the first meeting, Simmons and Roberson were present and would have witnessed the attack and possibly interfered. Although defendant contends that Ridolfi and his two companions were under the influence of drugs, Ridolfi and Roberson testified that they observed what happened and recollected it well. There was no evidence that Simmons suffered from any debilitating condition. By dropping off Simmons and deceiving Roberson about the purpose of his second visit, defendant made the crime easier to commit.

¶ 36   Defendant contends that, had he decided only later to rob Ridolfi, he would not have taken along Roberson. Aside from undermining his argument that he would have committed the offense the earlier time with Roberson and Simmons present, this argument is not persuasive on its own terms. Defendant would have taken more time to drop off Roberson at his home in North Chicago, a long way from Ridolfi's trailer. Moreover, defendant had a reason to bring along Roberson, whom he used to subdue Ridolfi after the attack and robbery were complete.

¶ 37    Finally, defendant contends that his reference to "poking" Ridolfi was ambiguous at best and could have as easily meant engaging in consensual sex with her as committing a crime against her. As noted, though, discounting any criminal implication for this terminology does not weaken the State's argument as to defendant's intent at the time that he entered Ridolfi's trailer. Indeed, defendant might have used a term with an innocent implication to further mislead the others about his true intentions.

¶ 38    In sum, the evidence proved defendant guilty beyond a reasonable doubt of home invasion. As he raises no other claims on appeal, the judgment must be affirmed.

¶ 39                                III. CONCLUSION

¶ 40    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 41    Affirmed.